3-15-0637 Consolidated with 3-16-0058 County of Will and Will County Land Use Department Appellants by Mary Chek and People Appellants by Carl Elitz v. Illinois Pollution Control Board, et al. at Lee Ivory Tipsoar Hey, before we start, have they checked if we can hang meat in this place? Is there a... She just did. She did it that night. She just did. Okay. Which way? Okay. Good afternoon, Your Honors. May it please the Court. I'm Assistant Attorney General Carl Elitz, representing the people. The appeal today is a review of a rulemaking by the Board, and I have to acknowledge as I begin that that is a very challenging standard of review for me. The question is whether the Board's decision is arbitrary, capricious, or unreasonable. But I hope I can convince you that in this case there are actually facts and a decision here that meets that high standard. We're asking for the Court to reverse the Board's decision and remand it back to the Board for additional rulemaking. The Board's decision is arbitrary, capricious, and unreasonable. First off... The standard isn't arbitrary, capricious. I mean, you hope you can meet that high standard. The standard is review, and I hope I can meet that high standard. And I would suggest that the Board's decision is arbitrary, capricious, and unreasonable because they've misconstrued some basic ideas. One is cost. What is the cost of the rule? Earlier during the proceedings in a decision, they suggested that there could be a high cost of these sort of testing regulations, and therefore the rule wouldn't accommodate that rule, accommodate testing. But we've had subsequent hearings since then with additional testimony, and all of the evidence, I would argue, shows that the cost of groundwater monitoring is quite reasonable. Witnesses testified pennies per cubic yard. The Board's current decision doesn't mention cost at all, and I would suggest that the Board has actually backed away from cost as a basis for justifying its decision, that in fact it is not now doing that any longer. But if the Court were to look at cost, the evidence doesn't support that. The Board also seems to have confused the idea of cost of remediation once there's a discovery of contamination with the cost of monitoring. And that's a serious error. The Board's concern should only be about the cost of testing the groundwater. If the groundwater is contaminated, that creates a different problem. So for that reason, we would argue that the decision should be reversed. But the most compelling reason to reverse the Board's decision is because it has left the notion of the eight years of material that is in these facilities that have never received the front-end tests, the screening, the certifications, and the road checking that happens as these trucks drive on to the facilities. They've never considered the eight years between 1997 and 2005 when these sites were taking this material, unchecked, and putting it essentially into the water table. This material was never subject to the current rules that the Board suggests are essential. Well, if the current rules say that the testing of this material is essential, as the Board has done in its decision, then what is the Board doing with regard to materials that was put in the ground in 1997 and 1998 through 2005? May I interrupt your argument with an observation? There's been some pushback because of the arguments that there's historical contamination that's there before these rules went into effect. Wouldn't groundwater monitoring establish whether and what levels the existing contamination is so that once the fill comes in under these new regulations, we know who is contributing to an increase in contamination? Is your question, if I may ask, Your Honor, is your question the old material versus the newer material, that distinction? Or are you asking about material that may have been there 100 years ago? My question is when they bring in the new material, they are objecting to testing of groundwater because they're saying there is some historical contamination from the past. From the past. How can you monitor groundwater without knowing what the starting point of past historical contamination might be? The rules that the Board adopted, the Part 1100 rules, set what are called MACs, maximum allowable concentrations or contaminants. I'm not sure which the acronym is. But the Board actually uses an objective standard to measure groundwater to the quality that they believe the water should meet. It's our view that the statute requires the Board to promulgate a rule that protects groundwater, and it doesn't matter whether the materials were deposited there by the industry in 1999 or whether it was deposited there in 2006. Do the MACs apply to the soil or to the water? The MACs, as I understand them, apply to soil testing. Right. And the soil then, we think, is a source of contamination to the groundwater. So if the soil exceeds the MACs, the logical inference, we think, the only reasonable logical inference is when that soil is placed in groundwater, the groundwater is then subject to being contaminated. Why don't you view it as subject to further contamination because there seems to be a prevailing theory that there is some past contamination that may already exist but has not been measured? We think that contamination under the rules, that the facilities that are operating should measure what's underneath their fill piles. And to the extent that that water is contaminated and poses a pollution or a threat to the public, that the industry should be responsible for cleaning that up. So is it your position that ignoring the past historical contamination that may already exist is arbitrary and capricious? Unreasonable. Yes, Your Honor, exactly. And I think if you agree with that premise, it proves itself because the board is saying that the front-end procedures are critical and yet, you know, for eight years, these facilities took fill material and didn't employ any front-end procedures. We just want to know what is in the ground now that has been contaminated or likely contaminated in some cases with this fill material. Well, can you find that out before new fill is allowed in? One of the witnesses suggested that he would like a rule that tries to set baselines and then... And that's where I was going, that you established a baseline for a site that is accepted, not front-tested fill. Yes, but I would suggest that that is not compliant with what the General Assembly did with the legislation. That in the two sections that are at issue, the charge the General Assembly gave the board was to protect groundwater at these facilities. The groundwater should be protected and we can't even know what is there until we're testing. The industry is very against the idea of testing the water because they recognize that some of the sites are going to fail the tests and that there's going to be consequences because in Illinois, we have very strong, since the 1970s anyway, rules about... Well, hypothetically, let's say you have a site that has untested fill from years past. Can you test that site to see whether there is contamination within the accepted limits or not? Of the water or of the soil? Both. Yes. At that point in time? At the current point in time, I think there's nothing stopping it. Is there any science there to suggest that from that point in time, those numbers would change, assuming no new fill? I'm sorry, I'm not sure I understand your question. Well, I've got a number. My site has this number of contamination, however you want to measure it, for both soil and water. Does that change over time if I never added any into the... I think... For science's sake, do we have any evidence? I'm always reluctant to tell you what the science is, but I think I have understood what the witnesses said, which was this material, the contaminants, can migrate in soil or earth, particularly when there's water and very particularly when there's acidic water. That's the testimony. So my question is, presumably, if that site tested is beyond an acceptable limit, whatever it is, then there has to be remediation, doesn't there? Yes. Okay. But let's say we test that site and it's not at that level. Will it increase or decrease over time? The rules that we proposed required annual testing, I think because of the sense that over time things can change, even without adding a fill to the site, because these materials can migrate, congregate, and go from being harmless to becoming dangerous. So what we believe an essential requirement of any rule that protects groundwater is that there be regular testing and that these numbers be checked, and the only way can the public be protected. But any other rule leaves open the possibility that materials deposited on these sites, maybe newer materials, but certainly the older materials, before there was any requirements essentially on this material, that material can migrate. Well, it seems to me that you're saying, and this is where you might want to go, it seems to me that the new fill that's coming in, and the rule is proposed that that be tested, am I correct? The fill itself, no. It can be certified as coming from a site that doesn't have a risk of contamination. If it comes from a site that has been impacted, then there has to be a sign-off by an engineer. The trucks have to be visually inspected before they come through the gates. So the public is protected in two ways, either certified or on-site testing of the new fill before it's deposited? Before the stuff is put on the truck, I guess. So there is protection in the front end, I have to concede that, but it isn't protection that's effective. It's protection that in fact does nothing with regard to material that has passed through the gates without going through the front end screening. But also, on this record, there's a great deal of evidence. How would that be possible? How is material that's currently filled at the site going to contaminate groundwater? Not currently. You said something's coming through the gates that wasn't tested. Are you talking about historical evidence? I'm sorry. If we assume that everything is tested as it comes through the gates, even material that's low, the material is capable of migrating and congregating and essentially cooking. Cooking is probably the wrong word. Was there any thought that the material that would test safe now through a degradation process becomes contaminated? Yes, Your Honor. Is that your strongest argument? It's certainly a strong argument. I think the argument with regard to the old fill is very compelling. It's probably my strongest argument. But the new fill also has that risk, that material that is capable of coming through the gates, all lawful, over time, material can migrate into groundwater. Without testing, no one knows what's going on with the groundwater, and there's no way to protect the public from material that is... Under the rules that you were proposing, where there's dewatering that occurs so that there's, if I understand it correctly, a barrier between the soil and the groundwater, then the groundwater testing isn't necessary until the dewatering ends. Am I correct? That's the rule that was adopted, I believe, or was proposed, yes. What are your feelings on that? That's a logical thing for the rule to do, because there's not the risk, as I was just mentioning... Of the migration. There's not the risk of migration. Dry material, it's very hard for things to migrate and congregate and... The dewatering actually creates kind of a liner effect. Yes. But they have to document... Yes, and under the rules that were proposed, if the site were to take down the water table, then it wouldn't have to test the groundwater. So those opposed to groundwater testing can avoid groundwater testing by dewatering. They can. And so the cost of dewatering, was that ever studied in comparison to... They can avoid the groundwater testing by modifying... They could only avoid it until they decide to stop dewatering. Correct. And if they decide never to stop dewatering... Then they don't have to test. Of groundwater testing. That's correct. And I think the board used that as a reason why the proposal was reasonably rejected. But I don't think that's accurate, because what that essentially does is it says, well, the rule isn't perfect. So therefore, no rule. And I think that's just faulty logic. The proposal was reasonable to the extent that there were problems. The board should have dealt with the problems and not thrown out the entire subpart change. So dewatering is a process of lowering the groundwater table. Yes. And how long can that be done? Well, again, I'm maybe outside the record here, but I understand that it can be done for a long time. The facilities... Workers can't work at the bottom of these pits unless the water table is lowered in many cases. The water table is actually higher than the lowest part of the pit. So they run the water pumps, I guess... You just drain your groundwater. Right. And then there's much less, I'm told, much less risk of migration and contamination, because there's no water for this material to migrate through. I have a question on the record with regard to the DOT holding pits, and I'm not sure if that's the right term. What's the right term? Holding? I'm not sure. How temporary are those holding piles? Oh, I see. I'm sorry. You're asking about the borrow pits? Yes. Okay. From what I understand, the borrow pits are seasonal, from which I mean... They're gone by the end of the construction season, and probably they exist when you're chopping up roads and then repaving. And again, my argument with regard to the borrow pits is that the idea that there's a problem with borrow pits and the rules, therefore we won't test anything, seems to throw the baby out with the bathwater, not to make a bad pun. But also, these facilities, because they're only seasonal, the idea of annual testing I don't think makes a lot of sense. And also, it's the government that's supervising this. And the borrow pits go somewhere. So whenever they go, they're going to be tested there. The borrow pits are, I think, just sort of holes on farmland or whatever, and the farmers are saying, okay, that's fine, go ahead and fill that area. That's a borrow pit. It's not the industrial kind of scale that we're talking about with the permanent facilities. So they're not removed from the farms? They're left there? I'm not sure, but my understanding is if someone has property that has a ravine in there or something and they're happy with IDOT dropping material there, then... That's helpful to me. Yes. One minute, please, counsel. One minute? Thank you. So I would argue that to the extent that the board uses borrow pits as a reason to have no groundwater monitoring at the permitted sites, it doesn't make any sense. That's not a reasonable decision. So for those reasons, because the board has misunderstood the notions of what the cost of monitoring is, because the board is not understanding the dangers posed by the old fill that came through the gates before 2005, because the board is not recognizing that the new material is showing all sorts of bad testing, the soil that's coming through under the current rules is failing the tests. For these reasons, we think that the rule is just leaving groundwater subject to being discovered as contaminated only when it migrates into drinking water, and that's a very bad decision. And the board's rule, as it was amended by the board, should be declared to be arbitrary, unreasonable, and capricious, and we'd ask that the court remain it back to the board with directions to adopt rules that include groundwater monitoring. Thank you. Thank you. Please check. May I please report? I represent Will County. Will County's concern in this case is very simple and very focused, very straightforward. It's simply that we think the board has lost track and lost sight of this constitutional mandate to protect the health and well-being of the citizens of the state of Illinois, and through that, protecting the groundwater. We're simply asking to test the water after the fill has been placed in it. So in Will County, there are nine quarries that are currently used as fill sites, and these nine quarries, nine of the ten, are all in Will County. In these quarries, huge amounts of material are being put directly into the water table. So the water that the people in Will County are drinking filters through this material. It seems entirely unreasonable to Will County, arbitrary and capricious, to refuse to test that water to see if it's clean, to see if it's fine, to see if it's safe. Before this gets to the consumer, nobody's testing it? So it goes to the water. Seventy-one percent of the citizens in Will County drink the groundwater from wells, so there are wells on farms, there are wells on properties. What's the percentage? Seventy-one percent. Seventy-one percent of Will County people get their water out of a well? Seventy-one percent get their water from the groundwater. I might have just missed one. What does the water treatment plant do? What are the percentage of people who are directly recovering water and consuming it from the groundwater? I don't know. Wouldn't that be important to know, though? I apologize for not knowing that. No, I don't know. I'm sure someone does. I certainly can make an effort to find that and get that information to the court. I think what Justice Smith is getting at is there is water treatment plants, are there not? Right, so there's another level of protection, I understand. But it still strikes me as a reasonable precaution that the state should take, that the state is remiss for not taking, to test the water right there at the site where we know the water is going through the water table, the water is going through the material, the CCDD and the USF material right there. We should check to see, is that a problem there? Should we start remediating right there? Is there something that can be done immediately? Help me out, because maybe I don't understand mechanically how this works. But what you're proposing is we can visualize a quarry that's below the water table, and we could drive the pit out by pumping out water, like mines do, and the quarry leaks do. Where do the test sites occur? Are they pouring wells down to groundwater? Yeah, what they're suggesting is four wells at each site. So there would be a well upgrade, so you test the water before it goes through the debris. And then there would be three sites, three wells downgrade, and you would test the water then after it's gone through the debris. And they would be at different levels. My understanding, like my colleagues, I'm not a scientist, but my understanding is that the aquifers in Illinois are at different levels, and then the water just flows kind of randomly once it's down there from place to place. So the idea with the wells would be to test it at different levels so you can try and get an idea of whether some contaminants have come through. In my perception from the record also, the industry's concern was not with the cost of dropping the wells and testing there, which is really the only thing that's at issue before this court, but their concern was, well, what if we find contaminated water? That's going to be a problem. That's going to be an expense. Will County's position is that's not our problem. Our problem is to be sure that the water is clean, and if they find that it's dirty, we need to do something to remediate that. But the system here, the plan to drop the wells downgrade from where the water table is going through the debris will tell us, is this a source of problem here? Is this where we can identify a source of the contamination? And arguably liability for that contamination downgrade. Correct. If there is no groundwater testing, then Justice Schmidt's question about the water treatment plant will catch contaminated water. That might be true, but they can't assign the contamination to any one of the nine fill operations involved. Correct. So the taxpayers will be bearing the cost of cleaning up the water that makes it to the treatment plant in a contaminated fashion. Your Honor, thank you very much. That is precisely where I wanted to go. Yes. Now Justice Schmidt wants to go. Well, if the water treatment plant has to test water because it comes into it so they know what they're dealing with and what treatment is correct. Yes. And so if all of a sudden they see a spike in a contaminant, they can hit the red button, and then people can go look upstream and test at that point. Where is this coming from? I understand that that would be a way to remediate the problem. I think a more effective way to remediate the problem would be to identify early on, like, is this a source now? I mean, who knows what could go through the water treatment plant? I mean, who knows if there could be things that slip through? I mean, not to be, you know, ridiculous about the whole thing, but Flint, Michigan. I mean, you know, it happens. Do you want annual testing even then  I understand. And Justice Holdren's point about could material degrade over time, could material that seems to be safe today not be safe tomorrow? I mean, it is fluid. There's no question about it. But I still think that in terms of safety, it's not. It's a reasonable position to test the water right there when it's just come through the debris to see if the debris has increased the contamination in the water that has made a difference. And as Justice Wright points out, then that helps assign liability. That helps the state determine, well, maybe we need to tax here. Do we need to tax everybody who uses this? Do we need to penalize? You know, I mean, all of those things are things that would help remediate the cost in a state that doesn't have a whole lot of extra money. Well, the current system doesn't prevent them from going out and if they find that somebody's polluting, that they've got a problem there, but we're mediating and penalizing and doing whatever under the current testing program. That's correct. And there are tests that go and they test the soil. But still, there is no system. There is no systematic way to test the water. And without a systematic way to test the water, we just don't really know what the status of the water is. One minute, please. Let me understand your point, if I understand it correctly, is that by waiting until the water hits the treatment plants, the public is going to be protected, but there's going to be a cost to clean it up. That shifts the burden to consumers of water to pay for remediation, whereas the groundwater testing imposes a burden on those accepting fill. And this is not a free service. I mean, they charge people bringing fill. So shouldn't the cost of groundwater testing be borne by those profiting from the delivery of fill to this place? Yes. But in reality, isn't the cost borne by the public general if you were depositing? They pass this cost along. You know that. I mean, they're in a market that's not competitive. That's true, but at least there's a way to identify and try and concentrate the penalty on the people who are causing the problem. And yes, they pass it along, but they don't pass it along to everyone who consumes water, right? They pass it along to... In your mind, who are the people that are causing the problem? Well, industry is putting the materials into the landfill. So generally speaking. I saw the water. The water material into the water. Thank you. Well, I'm thinking of the cartoon Poe, where he met the enemy and his need. The people are causing the problem, not industry. People are causing the problem. You create filth because people are doing things, right? Building, tearing down roads. Yes. So it's really the public that's causing the problem, not really the industry. And the public's going to be carrying the cost. Now the question is when and where is the cost going to be shared by the public? Well, Justice Holder, just a question. He supposes that everybody's going to be delivering clean filth as allowed under the current statutory scheme. But we all know there's going to be people that don't comply and sneak in dirty roads. There are 30. Justice Holder's question presumes that people, general public drives on the highways and they want to move out potholes and they want the government to come in and tear those roads up, tear them out and put new roads in. And so indirectly it's the public use and the public demand for good roads, highways and bridges, et cetera, et cetera, that leads to rebuilding roads, tearing out old roads, and creating filth. Not that Mr. and Mrs. Jones have taken a bag of filth over to the foreign I understand. There certainly is a cycle and everyone is part of the cycle. Right. And what is the mission of the agency? It's to protect whom? It's to protect the citizens in the state of Illinois. Correct. So really... And the citizens need clean water whether they drive on the roads or not, whether they don't think about what happens to the filth, whether they don't think about the cost of filling the potholes, whether they don't think about what it will take to tear down the building, they still need, need clean water. It's essential. It's the state's duty to provide that, to do everything in its power to be sure that the water coming through is clean. And shouldn't the cost of that be borne by the general public? Forgive me, Your Honor, isn't your point that it already is? One way or another. But maybe more accurately it would be better if it were shared with the general public. That's where we have general taxation and general appropriation. It is Will County's position, with all due respect, that it should be borne by those who are using the, who are actually putting the fill into requirements. If these fill sites were not available, the road construction, I don't want to use the word waste, but the road construction materials would go in waste. At four times the cost. That do require groundwater testing. Yes. So this provides, this new vehicle provides kind of a less expensive way to dispose of it. It was a much less expensive way, a much less expensive way to dispose of it. When there's a Chicago housing project that puts demolition debris into a landfill and the cost is four times what it is to put it into, you know, an approved site, a permitted site. So everyone benefits from these sites. These sites are good for everyone, goose and gander. And our position is just that we need to do everything in our power to keep them safe, to keep the water that's coming through them safe. I think we owe that to the people, not just of Will County, but really everyone. I think from a policy standpoint, everyone should be paying for it. Understood. And again, Will County's position is that those who are using the fill sites should be the ones to pay for it. Well, that seems to be the way all government's going. Anything to avoid a general responsibility and cost in general. Okay. Thank you. Good afternoon. My name is Marie Tipsord and with me today is Johnson Mark Powell. We're both attorneys at the Illinois Pollution Control Board and we've been appointed Special Assistant Attorneys General to represent the board in this matter before you. I also have the privilege of serving as the hearing officer in this rulemaking over numerous hearings and was helped to draft all of the opinions for the board. I think it's important to remember that a key problem here is demonstrated once again that while the people believe that the board has misconstrued the statute, it is in fact the people in Will County that have misconstrued what this proceeding is about. This proceeding is about a rule that was proposed under Sections 22.51 and 22.51A. Those are statutory provisions that relate to CCDD and undeterminated soil fill sites and the regulation thereof. In those sections of the act, the board was required to adopt rules that protected groundwater. There were many different ways for us to do that. Only one of them and only in the CCDD rule or CCD language is that does that include the monitoring of groundwater. We want to protect groundwater, but we're not directed to do a comprehensive groundwater monitoring program for the state to detect historical contamination in the state. Therefore, in this proceeding, the board concerned itself with the proposal and within the limits of the Section 22.51 and 22.51A authority and looked at whether or not front-end screening would be sufficient to protect groundwater. The board found that it was and found that groundwater could be protected in a technically feasible and economically reasonable manner without groundwater monitoring. The record amply supports the board's decision. You asked a question about baseline, Justice Holdridge. I would like to clarify that a little bit. That is actually one of the problems with the IEPA's proposal that included groundwater monitoring before the board went to first notice. One of the questions or one of the issues that came up was you can't just sink four wells down gradient because you need to know what's coming in up gradient. Because if you don't know what's coming in up gradient, you don't know how much of the contamination might be a result of the fill. There was also concerns about what parameters should be monitored. The proposal had all of the Class I groundwater monitors, groundwater standards to be monitored. There were arguments that that was too comprehensive. It wasn't necessary. The people themselves had issues with the groundwater monitoring proposal and that they disagreed that it should be a self-implementing program. But more importantly, there was a lack of evidence in the record that CCPD and uncontaminated soil fills were contributing to groundwater contamination. In fact, there was evidence, and again, to one of your questions, Justice Holdridge, there was evidence in the record before the board went to first notice about a facility where they sank several test soil borings. The result of that was such that the expert testified and filed comment that said they really don't need to do groundwater monitoring for these. The board strengthened front-end requirements. You can either have a site that comes, you can either have fill that comes in from a site that is not a potentially impacted property. That would be completely clean fill, a park, someplace like that. If you have a facility or if you have something that's dug up from a site that might be impacted, then you have to have specific pH levels. You have to meet max, which are the maximum allowable concentrations. That's the first step before it's certified. That's done by a licensed professional engineer or licensed professional geologist. They must sign off on that. That then comes to the facility. At the facility, there is still backup testing there with the use of inspections, visual inspections, and equipment onsite of the facility before that material is placed in a fill. The board decided that based on strengthening the front-end requirements, ensuring that the fill that came to the facilities would be clean, as that term is defined by the act and the board regulations, there was not a need to do groundwater monitoring, especially given the costs of groundwater monitoring. I know that the people, again, brought up the issue that cost was not really, the board had left that issue behind when it got to sub-docket B. I totally disagree. The board, not once, not twice, but three times, devoted substantial opinions and orders to the issues in this case. Sub-docket B was entirely on groundwater monitoring. Many of the people who testified before we went to first notice, who filed comments at second notice, came in again and said that the cost of groundwater monitoring outweighs the usefulness of it. We had testimony that many facilities... What was the testimony as to the cost of contamination to the public? That came in as a part of the whole discussion about whether or not, because part of the proposal by IEPA was remediation and corrective action. There was discussion and that came back to the issue that groundwater monitoring is more expensive than you're saying because we have to establish whether or not we're even responsible for the contamination. Yes, there was discussion about what remediation would cost. There were a lot of people who testified that they would close rather than start groundwater monitoring. The reason for that is that... They don't have to close, they just have to dewater. The problem with dewatering works for some of the facilities, but you do reach a point where dewatering is no longer feasible because you're filling in the area. As long as you keep a common impression, you can do the dewatering, but you're going to eventually... Because the idea is to get these to grade. Eventually, you're going to reach a point where... If there's nine fill locations in Will County, if one or two closes, so what? Then that's one or two less that people like the Chicago Public Housing Authority or IDOT or other places have to take fill at one-fourth the price based on the statistics that Will County just gave us. Okay, so the Chicago fill comes out to Will County quarries and who's going to bear the cost? The Will County taxpayers if that fill contaminates their water. Again, that's assuming that there will be mistakes or that the fill that comes in is not clean. As that term is defined by the Act and board regulations. That would mean that someone's violating the law. If they put unclean fill into those sites, they're violating the law. And the response to that is enforcement action. And when you do an enforcement action, there are many ways that you can then enforce against someone and you can require remediation as a part of an enforcement action. The board itself has declared we require remediation in different types of cases. Does it also not require in future that that particular violator do groundwater testing for forever? Yes, and in fact the Linwood case, which is one that we've heard a lot about in the briefs and stuff, which is not really applicable because it would not have been subject to these rules under any circumstances having closed before these rules were adopted, would not have been required to groundwater monitor under the rules that were proposed by the IEPA. So Linwood is one that as a part of its enforcement action is being required to do groundwater monitoring. And it's also interesting to note that that is the only facility that has shown contamination of groundwater is Linwood. Linwood didn't just accept CCTT, it also accepted other materials. And back to even to the dewatering, what we do know is reliable lines that does dewater is actually taking this water and they have to discharge it under an NPDES permit to the Des Plaines River. They're not threatening to close, are they? No, but they also have been testing because they discharged as a part of an NPDES permit. And when testing shows that water that is coming into contact with the fill has not exceeded the groundwater standards, the Class 1 groundwater standards. I do have just a question. Let's say a site operator does dewatering, and it goes up to grade and the site is closed, am I correct? How long does dewatering have to continue thereafter? Or is it even required? It would no longer be required. And it would probably have stopped before it got to grade because again, dewatering is, and I'm probably telling you stuff you may already know, but dewatering is that you create a kind of depression so that the groundwater comes into the site. So you're going to reach a point where your fill is at the groundwater level and it's no longer possible. But the groundwater is still then going through that fill, even though you're up to grade. Right. But again, if it is a facility that's been regulated under Section 22.51 and 22.51A, the fill that is accepted under those provisions is clean fill. And as a further example, one of the contaminants that the people have been concerned with from the get-go in this rulemaking and filed comments all along the way is PNAs, which are a part of asphalt. First of all, asphalt was specifically included in the definition of CCDD by the legislature, but we also had a testimony that it's not going to migrate. The way it is in asphalt, that's not going to become soluble, it's not going to leach into the groundwater, so it's not going to become a problem. And again, I remind, they talk about the facilities, you ask questions about the whole idea of treatment of water. We have no evidence that a groundwater contamination is occurring as a result of these fills. And that was significant to the board's decision in protecting what went into the fills now and the cost of groundwater monitoring. There was one facility who voluntarily put in groundwater monitoring. It cost them over $300,000 to put in the groundwater monitoring. That's just installed, that's not the annual requirements to monitor the parameters. What kind of income do they get from accepting the fill? And that depends on tipping fees, and honestly I don't recall that there was anything in the records on the tipping fees. It was more general information that it was substantially cheaper to place it in these facilities than into a landfill. I also would like to discuss borrow pits for just a moment. What's the assumption? Facilities versus a general landfill? Yes, the CCDUSF facilities versus a landfill. I believe what county gave us is that it's four times more expensive to go to a landfill. I think that's correct based on the record. With borrow pits, borrow pits are... IDOT fills the borrow pits with CCDD and USF, uncontaminated soil fill. They do some of the same front end screening that the board required for CCDD and uncontaminated soil fills. They then place that in the borrow pits throughout the state. They're not subject to groundwater monitoring, and I believe that was statutory, you can double check that, and I think the statute actually accepts them from that. But they're not in the business of accepting fill. They're in the business of repairing roads and delivering small amounts of fill to other locations. They're not profiting from the fill. I understand that, but by the same token, while they may not be profiting, it's still the legislature's intent that they can use the exact same material throughout the state and not be required to do groundwater monitoring. The risk of violating the regulations by the state is a little bit lower than the risk of violations by those profiting from accepting fill. In my mind, I understand that. I accept that. I accept it. But again, if we have people who do misdeeds or have an unfair misintent, all the rules in the world aren't going to change that. You know, even if we have groundwater monitoring, if they're going to violate the law... I give you that. Then they're going to violate the law, and that's where we come back. That's why it's important to have enforcement actions. Can I interrupt you and ask you to go through Section 22.51F1? The rules may include standards and procedures necessary to protect groundwater. This is the statute. Right. Which may include, but shall not be limited to, the following requirements regarding testing and certification of fill, of soil uses, fill material. We have that, correct? Yes. The next is surface water runoff. Do we have that? Yes, to some extent. And that's general stormwater regulations. Okay. Liners. No liners. Other protective barriers. That is where the max and the pH and the soil. Those are protective barriers, because they're guaranteeing that what comes in is clean. Monitoring. And this is where I'm confused. If there is monitoring, it's including, but not limited to, groundwater monitoring. Correct. So is there monitoring going on? It's interesting you should ask that, because that actually was something that we discussed, and I don't think we discussed it in our opinions, and I don't want to get in the way of the process. Is there monitoring? Monitoring arguably could include what happens with the visual inspections, the use of the PID meter when the soils come in, which are the checks at the site. So if there is monitoring, and I think you're telling me there is, it has to include groundwater monitoring by statute, doesn't it? The use of may by the legislature, since the board may. May, yes. But if there's monitoring, it says including, but not limited to. So your position is may in the preceding language means? That we don't have to do groundwater monitoring. But other monitoring doesn't trigger the requirement of groundwater monitoring. I just want to understand. Right, and I think that it comes down to what you mean by monitoring. I personally would argue that those things are monitoring, but they may not be considered by others. They may just be further inspections. But in this case, it did come down to the question of the cost of groundwater monitoring versus the evil that we're supposed to be protecting against. Let me go on to that. Corrective action, is that in the current rules? No, it is not because there is no groundwater monitoring, so there's no need for corrective action. What about corrective action with regard to the front end requirements? Well, with the front end requirements, if something comes to the field that doesn't meet the requirements and the inspector catches it at the site, they reject the load. Okay, record keeping. They have to keep records and report. Closure and post-closure care, I'm assuming that's financial assurance. No, we determine not to do financial assurance. Next is post-closure land use controls. That's part of the post-closure care, yeah. Location standards, that's there, I would guess. Actually, no, because most of these are already existing facilities, so it's really difficult to do. And modification of existing permits. They are required to file permits, but that's more an agency. Okay, that helps me a lot. I appreciate you indulging me. Oh, that's quite all right. It's my pleasure. Two minutes, please. Thank you. Again, I want to emphasize that there's a lot of discussion about historical contamination. There was also a lot of discussion about the cost. The facts in this are very clear that the cost of groundwater monitoring were substantial. It would have resulted in the closure of facilities. So the board strengthened front end requirements to ensure that the materials that came to the fill would be clean, as that is defined by the Act and Board regulations. The historical contamination is something that we were not charged with addressing in this rulemaking. That's not to say that we wouldn't in another rulemaking under a different section of the statute. The reality is we were implementing provisions in section 22.51 and 22.51A, which did not charge the board to do a comprehensive groundwater look. Well, let me ask you this. Through what works, whether there's evidence that there's contamination coming out of one of these pits, I'm assuming you wouldn't care whether it was new material or old material that you'd order these people to clean? Absolutely. If contamination is found, then they have to clean it up. And the fact that you say, well, that must be the clean material in there and it must have been that old material that was there before, you'd say, I don't care. Clean it up to the screen. Yes, and that would be through the enforcement process. The board was required to protect groundwater contamination by CCDD and uncontaminated soil fill operations operating under Part 1100. The board's decision was sound and the record supports the board's decision. I urge you to affirm the board's decision as the board's decision was not arbitrary, capricious, or unreasonable. Thank you very much for your time. Justice Schmidt, your last question, I sort of think it's the nail on the head. The last question you asked, I think, makes the most important point I'd like to make, which is the fill that is being used in these facilities, regardless of when it was deposited, needs to not threaten groundwater. And what's the evidence that it is? We have evidence that testing of soils that have been recent deposits that are far in exceedance of the requirements. So we know that these facilities are accepting material far in excess of the prescribed max. So we found proof that metals and various arsenic, there's a whole list that's in the brief, of the materials that we're finding in these sites from the current materials. That's materials that have been after the board's rules have been in effect. And my point is we also have eight years when the board's rules were not in effect at all. So if the current materials... What have you done about the current materials? Have you ordered remediation? I believe that gets referred to the board or the people bring an action to seek cleanup of that material. The board's rules don't seem to acknowledge that the bringing of material onto these sites with contaminants in them is going to migrate to groundwater. And the statute doesn't order the board to protect drinking water. The statute orders the board to protect groundwater. So the General Assembly didn't have in its mind it's good enough to protect people's drinking water. It wanted the groundwater protected because it recognized that these things migrate. Ms. Tipsworth said the material is clean and suggested that that means it's not a risk to groundwater. And I just think that's wrong. Clean material over time can degrade and migrate in the earth, especially when we have acidic rain or the water's acid, which is also some of the things that the testimony was. If that happens, if these clean materials start to break apart and migrate through the water table, they end up in the groundwater. And when they hit the groundwater, I would suggest at that point the intent of the General Assembly is throw it because the General Assembly doesn't want the groundwater contaminated. Now, it's true that groundwater is not drinking water. And before people drink water, if they don't have their own well, maybe they'll be protected by the municipality that treats their water. Two points. First, there's a lot of uses for water that isn't drinking water that doesn't go through municipal treatment. Second, some people have wells and drink their own water off their own property. That's not that uncommon, but it's beside the point. Does groundwater feed creeks and things like that? Does it affect them? Again, I understand. I think river water, creek water, and I might be wrong about this, is groundwater. But mostly what groundwater is is the stuff we don't see. There's a lot of water under the ground that people don't see every day, but it's there. It gets drawn up. Industry uses it. People use it for all sorts of purposes, including drinking. Is the water in the aquifer, is that groundwater? Your Honor, again, I'd have to say I think it is, but I'm not a geologist. But my understanding is there's surface water, which you can see as puddles and that sort of thing. And then once it gets into the ground, it's groundwater. And certainly when it gets to the water table, it's groundwater. And water that washes across all these farm fields out here with the fertilized pesticides? Well, I think it's surface water until it becomes groundwater. But, yeah, surface water becomes groundwater, becomes drinking water at some point. It all is a big cycle. It's the water cycle, right? But the groundwater also feeds lakes where it does. Yes, we had testimony from forest preserve people who were very concerned about the contamination of the forest preserves from materials that are being put into these built facilities. Please understand our point. It's not that it's that we want to know what's in the groundwater. It's not that we think it's necessary to assess blame. We just want testing so that the Board knows that there's been some problem with the groundwater. At that point, the Board is free to adopt rules, and the General Assembly can pass statutes about who should pay the costs, who should bear the costs. Let me, out of the current set of rules, is there anything we can stop and hope to mediate or put out there and test some groundwater around these facilities? One of the witnesses made that suggestion, and so it's my understanding. My question is, is there any provision to that? I think the answer is probably no, because this witness insisted that, and no one challenged it. And if so, I was going to say, apparently had they done it and got some evidence that there's a problem to justifying this new rule. Well, not to dodge your question, Your Honor, but I'm here representing the people, and the EPA is not here. We proposed a rule that was very stringent. EPA took it and took it down a notch. When the Board got it, they took it down another notch. And the position we staked out on appeal is not that the EPA's decision to bring the rule down a notch was arbitrary, capricious, and unreasonable. We didn't like it, but they did take it down a notch. But we don't think what the Board did to the rule was to strip it of its effectiveness and to violate the statute. Because at this point, I don't think the Board is protecting groundwater. As Ms. Tipsworth said, she said, this material is clean. We heard that theme throughout the witness testimony. I don't really... I think that's wrong. That testing proves it's wrong, but let's assume it's true. That still doesn't show that CCDD, an uncontaminated soil fill, won't have materials in them that migrate, congregate, and then cause a risk. Not to drink any water, even. Or degrade. Or degrade, yes. That was our point with regard to the asphalt. The witness has said the asphalt's inert. Okay. Is it inert forever? Does acid rain ever change that inertness? Does it ever start to leach away? Would you ever put a stick of asphalt in a glass of water and drink it? No. No one would do that because your sense is that's a petroleum product. You don't want to put that into water. So it may be true that in general there's no danger from PNAs and asphalt and we can put them in the ground. But we think we should test the water in which they sit so that we can know whether the water is either contaminated or at risk of becoming contaminated. Right now we have no way of knowing what's in the groundwater that's under these facilities, and we think we should test it. Do we have a state, this labyrinth of government, of regulated government we live in, do we have an Illinois Water Survey? Don't we have an agency, a government agency, that's supposed to survey this water? I would argue... That's a general appropriation. Your Honor, I think that's the EPA. Oh. I think the EPA, and what the EPA is charged to do by statute is to propose rules that are reasonable and then adopted by the board. I understand that the board has the right to fiddle with the rules and change things around, but I just think in this regard they've done something arbitrary, capricious, and unreasonable, and for that reason should be struck. Well, what's unreasonable about asking the EPA to do the job and go out and run some tests, then if you find there is a problem, instead of, you know, because everything has a cost, you know. I would like to be safe driving down the road. We want everybody to be safe. We don't require everybody to drive tanks at a 20 mile an hour because there's risk-benefit analysis in everything we do. And we have a state agency that's supposed to do those calculations, and it decided not to do them. Risk-benefit analysis? Yes. That's what I think the Department of Economic Opportunity, I believe it is, was asked to do by the board, and the department said no. And that's one of my arguments is we don't know what the cost is, although the agency offered testimony, if I might, that seems to contradict what Ms. Tipsworth said. They said that the cost of the wells, the design, and the analysis would be 12 cents per cubic yard over a 10-year period, which meant for 96% of the facilities. So for the vast majority of facilities, we're literally talking pennies per cubic yard, and as you can imagine, these large trucks have many, many cubic yards. This is cubic yards being delivered at a quarter of the cost that it would cost them to store in line. Yes. And, Your Honor, that's part of the problem because if that truck goes to a line fill, the operators pay four times the cost. So these facilities are a great benefit to operators. There's a tremendous incentive to divert trucks that ought to go to the line of landfills and send them over there. And what happens under the rules? They get rejected at the gate, and then they get sent over. So if you have a truck, why not see if you can't get through the gate? Now, I understand there's certifications and everything else, but the risks here are very great to groundwater, not just to drinking water, to groundwater. You say, well, it's the cost of these guys, but here's the simple economic reality. When their costs go up, and many of this material is coming from public projects, guess what? What do you do if you're in business and your overhead increases? You raise your prices. And so, ultimately, the taxpayer pays for it anyway. Before 1997, all of this material went to line landfills. In 1997, we made a change in the law, and we created this idea of clean construction debris. And maybe it's been a great boon, and maybe everyone is saving money, but let's test the groundwater. That's my only argument. In 1985, there was no CCDD sites. That happened in 1997. And for eight years, nobody did anything, essentially. And then in 2005, we started doing a little bit of stuff, and all this EPA is saying is we need to see what's under these sites. If it comes back clean, wonderful. If it comes back bad, then maybe we shouldn't have done this in 1997, or maybe there's other things that can be done. It may be in a stronger position if they went out and ran a test, and it comes back bad, and then you go to the board and say, well, what's going on? What do you have here to express yourself? I suppose that will be what happens if we can't. I thought that the statute would clean this up when the General Assembly said pass a rule that requires groundwater testing. That's the way I read that statute, 2251A and 2251. So we'd ask the court to send this back to the board with directions to promulgate a rule that includes testing of groundwater. Thank you, Your Honor. Thank you all for your arguments here today. The matter will be taken under advisement. Written disposition will be issued for being a brief recess.